**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BOX DESIGN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 3053 |
| | ) | |
| vs. | ) | Judge William A. Hibbler |
| | ) | |
| BOX STUDIO CHICAGO, LLC, | ) | Magistrate Judge Geraldine Soat Brown |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff, Box Design, LLC ("Box Design"), by and through its undersigned attorney's, hereby submits its brief in support of its Motion for a Preliminary Injunction against Defendant Box Studio Chicago, LLC ("Defendant"). In support thereof, Box Design states as follows:

**INTRODUCTION**

Box Design is entitled to a preliminary injunction to halt Defendant from infringing on its trademark by using the word "Box" in its name. The use of the fanciful word "Box" in its name renders Defendant's name confusingly similar to that of Box Design and blatantly copies Box Design's trademark. Defendant's use of the word "Box" in its name only commenced in December of 2007, while Box Design has been in business in the Chicagoland area using the "Box" mark for several years. Defendant's infringement of Box Design's trademark is likely to cause confusion, mistake and deception as to the source of Defendant's services, and it must be enjoined from using the "Box" mark in the Chicagoland area.

## FACTUAL BACKGROUND

### Box Design's Product Trademark

Box Design is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  Box Design provides architectural and design services in the Chicagoland area, including developing green spaces.  Box Design has done business under the name of Box Design Studio and has been designing and offering its services under these names since approximately December of 2001. (Complaint ¶ 5). Indeed, Box Design is the proprietor of the United States Trademark Registration for the mark BOX®, Reg, No. 3,088,373. (Complaint ¶ 6). Box Design elected this fanciful mark and has a distinctive box logo design, which is also registered. (*See* Declaration of Kevin Fox, attached here as Exhibit A, ¶¶ 5, 7).  Box Design's services have enjoyed tremendous success in the marketplace and it has been recognized as one of the pioneers in "green roofs," where a person, or entity, creates green space on the roof of a building, in an attempt to reduce the greenhouse effect. (Complaint ¶ 8). In fact, Box Design has received acclaim in the media as evidenced by magazine and news articles. The BOX service mark is recognized by members of the consuming public as an indicator of high quality products and services from a single source. (Complaint ¶ 9).

### Defendant's Name and Trademark Infringement

Defendant has operated under the name "Box Studio Chicago, LLC" since the date of its incorporation on December 28, 2007. (A copy of the Articles of Organization for Defendant is attached hereto as Exhibit B).  Defendant is affiliated with a company based in Denver, Colorado that uses the name "Box Studios, LLC."  It has been advertising, promoting, marketing, distributing and/or offering for sale architectural services, including "green spaces" under, or using, the name

"Box"and has an office in Chicago, Illinois. Defendant's infringing "Box" mark has also been advertised on a website owned by Defendant located at www.boxformation.com. Defendant is not licensed by Box Design, and at all relevant times was not authorized by Box Design to use its service mark in the Chicagoland area. Additionally, on its website Defendant has linked print articles that illustrate projects, and the success of green spaces, including those devised by Box Design in Chicago. This is done only with the intent to confuse consumers who may visit the website into believing that Defendant was responsible for the work described in the articles and does not provide any indication that the projects were actually that of Box Design.

In letters dated March 20, 2008 and April 3, 2008, counsel for Box Design demanded that Defendant cease and desist all use of the word "Box" in connection with Defendant's architectural services. Defendant has not responded to counsel's letters. Nevertheless, Kevin Fox, president of Box Design, spoke by telephone with Daniel J. Kraiss, an agent of Box Studios. Kraiss tacitly admitted that he knew of Defendant's use of the "Box" mark and that his use of the "Box" mark was confusing and improper. (*See* Declaration of Kevin Fox, ¶ 19).

Defendant's use of the BOX mark in connection with its architectural services has caused actual confusion in Chicago. Specifically, one of the contractors working on a project contacted Box Design to discuss the project matter with it as it was under the impression that Box Design was affiliated with the project due to the Box mark being used on the project plans. (*See* Declaration of Kurt Horvath, attached here as Exhibit C). When Defendant elected to use the word "Box"in its name it did not pay to use the well established "Box" mark, however, it clearly elected to use the name "Box" with the knowledge of Box Design's success and reputation. Defendant's choice in name compels the conclusion that Defendant is intentionally copying Box Design's service mark and

-3-

as noted above, Defendant has even linked an article on its website that refers to Box Design's work. This is a blatant attempt to confuse consumers who visit Defendant's website into believing that it was responsible for work performed by Box Design or, at the very least, attempting to lead consumers to believe that Box Design and Defendant are affiliated. Either way, Defendant must be enjoined.

**ARGUMENT**

A preliminary injunction will be granted if the moving party:

(1)　has some likelihood of succeeding on the merits;
(2)　has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied;
(3)　if the balance of harms weighs in its favor; and
(4)　if an injunction will not harm the public interest.

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). If the moving party cannot establish either of the first two prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider the third and fourth requirements. *Id.* In weighing the four factors the court will employ the "sliding scale" approach: the more likely it is that the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed on the merits, the more the balance need weigh on its side. *Id.* at 12 ("the 'sliding scale' is subjective and intuitive").

## I.　BOX DESIGN HAS A LIKELIHOOD OF SUCCEEDING ON THE MERITS.

Box Design will likely prevail on its claims of trademark infringement, false designation of origin, unfair competition and deceptive trade practices under the Lanham Act and Illinois Law because it can prove the essential elements of these claims, namely, (i) that it has a protectable

-4-

interest in the mark at issue, and (ii) that Defendant's use of the "Box" mark in its name is likely to cause confusion. *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001).

As the Seventh Circuit has held, the ultimate inquiry always is whether, considering all the circumstances, a likelihood exists that consumers will be confused about the source of the infringing product. *See CAE at* 667.

It is important to note that neither Box Design nor Defendant are in the business of making or selling boxes or anything related to boxes. Instead, they are both architectural and design firms. Box Design elected to use the fanciful name "Box" in its name and it has been using it for several years. (*See* Declaration of Kevin Fox, ¶ 5). Over those years, Box Design has built a name and reputation for itself in the Chicagoland area, revolving around the "Box" mark. To protect the unique nature of its name, Box Design went so far as to have the word "Box" registered as its trademark. This is not a case where a competitor has elected a generic or descriptive name. Instead, Defendant has copied the well-known and exclusive name of a competitor in this market in a clear effort to usurp Box Design's business. In this circumstance, Box Design has a very great likelihood of succeeding on the merits therefore a preliminary injunction should be granted.

**A.    Box Design Has A Protectable Interest in the Mark.**

Plaintiff is the proprietor of a valid service mark properly registered with the U.S. Patent and Trademark Office. Box Design's federal registration constitutes prima facie evidence of "the validity of the registered mark... the registrant's ownership of the mark, and... the registrant's exclusive right to use the registered mark in commerce...." 15 U.S.C. §1057(b). Moreover, the Box Design service mark is strongly associated with the Plaintiff and serves as an indication of origin. Plaintiff's established use of the "Box" mark also provides complete protection under Illinois law. "Under

-5-

Illinois law, proof of a trademark infringement is sufficient to establish a violation of the Illinois uniform Deceptive Trade Practices Act and constitutes unfair competition under Illinois common law. *TMT N. Am., Inc. v. Magic Touch, GmBH,* 124 F.3d 876, 881 (7th Cir. 1997) (holding that "federal and state laws regarding trademarks and related claims of unfair competition are substantially congruent.") *and Pirelli Armstrong Tyre Corp. v. Titan Tire Corp.*, 4 F.Supp.2d 794, 799 (C.D. Ill. 1998).

    **B.**    **Defendant's Use of the "Box" Mark Creates a Likelihood of Confusion With Box Design.**

A review of the evidence and the facts set forth and summarized herein establish a likelihood of confusion arising from Defendant's blatant copying of the Box Design trademark. The Seventh Circuit has set forth a seven-factor test to analyze the likelihood of confusion:

(1) the degree of similarity between the marks in appearance and suggestion;
(2) the similarity of the products for which the name is used;
(3) the area and manner of concurrent use;
(4) the degree of care likely to be exercised by consumers;
(5) the strength of the complainant's mark;
(6) any evidence of actual confusion; and
(7) an intent on the part of the alleged infringer to palm off its products as those of another

*Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1330 (7th Cir.1977).

None of these factors by itself is dispositive of the likelihood of confusion question. Different factors will weigh more heavily from case to case, depending upon the particular facts and circumstances involved. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the "most important factors" in a likelihood of confusion case. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir.

2000).

### (1)     The Degree of Similarity Between the Marks in Appearance and Suggestion.

The Seventh Circuit has held that "in assessing whether products are similar, the question is 'whether the products are the kind that the public attributes to a single source.'" *Personeta, Inc. v. Persona Software, Inc.,* 418 F.Supp.2d 1013, 1016 (N.D. Ill. 2005). "When considering whether products are closely related for the purpose of likelihood of confusion, '[a] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'"*Id.* at 1016-1017. In assessing the similarity between the parties' marks, the court must "compare the marks in light of what happens in the marketplace." *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115-16 (7th Cir. 1997) (Court reversed the trial judge's denial of preliminary injunction, in finding similarity between the marks, Court noted that the eye-catching salient word in both companies' names was Meridian, meaning the parties were using essentially the same mark.).

Likewise here, Defendant has used a portion of Plaintiff's name for its own. But, they did not use the word Design, which is a descriptive word which refers to the type of services. Instead, Defendant has taken the word "Box", the part of the Plaintiff's name which distinguishes it from everyone else in the Chicagoland market. Defendant's use of the "Box" mark is critical when market factors are considered. Plaintiff has built a reputation and name recognition in the Chicagoland area with the word Box over the last several years. Defendant, a company founded in Denver, Colorado, opened its doors in Illinois in December of 2007.  Defendant, by using the name "Box" in this market, is banking on the good will which Plaintiff has established.  The "Box" mark has already

been established in the Chicago architectural market and is readily identifiable with the product and services of Box Design. "[O]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion. It is the second user's responsibility to avoid confusion in its choice of a trademark, and that responsibility must include choosing a mark whose salient portion would not likely be confused with a first user's mark." *Forum Corp. of N. America v. Forum, Ltd.*, 903 F.2d 434, 440 (7th Cir. 1990).

In this business, if a company's name is not recognized by perspective customers, it is difficult to get projects or even an appointment with a customer. (*See* Declaration of Kevin Fox, ¶ 17). The nature of the architectural services market is clearly one where the name and reputation matters. Defendant's use of the "Box" mark in its name has the very foreseeable potential to confuse consumers in the architectural and design market. Since Defendant's name is virtually identical to that of Box Design, this factor weighs heavily in favor of Plaintiff.

**(2)    The Similarity of the Products For Which the Name is Used.**

"'Closely related' products are those that 'would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 678 (7th Cir. 2001). Exactly like Box Design, Defendant's intended market is architecture and design, including green spaces. Moreover, Defendant markets and sells its services into the same market as Box Design, the Chicagoland area, and the parties are vying for the same customers. Especially with respect to the niche market of "green spaces." Indeed, the plans about which Mr. Horvath called Mr. Fox involved a green space. Therefore the parties are in direct competition with one another. Clearly here, the same type of services are offered by both parties to the same consumers. Therefore, the similarity

of products or services weighs in favor of Plaintiff.

### (3)    The Area and Manner of Concurrent Use.

In analyzing this factor, a court considers "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp. of N. America v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). Clearly, there exists concurrent use among the parties. Here, the parties are in the same type of business in the same area – they both offer architectural and design services in the Chicagoland region. Clearly, there exists concurrent use among the parties and this factor weighs in favor of Plaintiff.

### (4)    The Degree of Care Likely to be Exercised by Consumers.

In the instant case, Defendant has chosen a name that is highly likely to confuse even sophisticated customers. Even if a costumer realizes their mistake and is no longer confused, trademark infringement has still occurred. "The degree of care exercised by consumers could lead to initial interest confusion. Initial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) (Finding fair likelihood of success on the merits based on similarity of marks Copitrack and Copitrak, parties were direct competitors and the degree of care).  Here, because Defendant has chosen a name essentially identical to Plaintiff's, putting aside the instance of actual confusion previously noted, it is easy to imagine that other, potential customers may become confused, even if they are sophisticated and using a higher degree of care. This factor weighs in favor of Plaintiff.

**(5)     The Strength of Box Design's Mark.**

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000). Box Design began designing and offering its services using the name "Box" in approximately December of 2001 and has been the owner of the United States Trademark registration for the "Box" mark since May 2, 2006. Box Design's mark is a strong one in the Chicago architecture market and one that consumers associate with Box Design's work. The strength of the "Box" mark can be attributed to the fact that Box Design's services have enjoyed great success in the marketplace and have been publicly recognized in the media. Thus, customers seeking architectural services, especially those who are developing green spaces in the Chicago area, can readily associate the services of Box Design with the "Box" mark. Box Design has spent years developing the strength of the "Box" mark and has exclusivity with respect to the use of the mark in this market. This fact, coupled with the distinctive nature of Box Design's services, establishes that Box Design's mark is strong and therefore deserving of wide protection. The strength of the Box mark favors the entry of a preliminary injunction.

**(6)     Any Evidence of Actual Confusion.**

The law does not expect Box Design to tender actual confusion in support of its claim. *See, e.g, Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir. 2000). However, evidence of actual confusion "if available, is entitled to substantial weight." *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1118 (7th Cir. 1997). In fact, "in every case, even one in which a preliminary injunction is sought, actual confusion is the best evidence of likelihood of

confusion." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988).

In the instant case there is evidence of an instance of actual confusion between Box Design and the Defendant. Kurt Horvath, owner of Intrinsic Landscaping, was asked to provide a quote for services to provide a green roof. (*See* Declaration of Kurt Horvath, ¶ 4). Mr. Horvath reviewed the project plans and saw the name "Box" where the architectural firm would list its name. (*See* Declaration of Kurt Horvath, ¶ 5). Mr. Horvath immediately thought of Box Design and was glad at the prospect of working with Kevin Fox. (*See* Declaration of Kurt Horvath, ¶ 5). Mr. Horvath is not aware of any other architectural firms which use the name "Box." (*See* Declaration of Kurt Horvath, ¶ 6). While looking at the plans, questions came up and Mr. Horvath called Kevin Fox to discuss. (*See* Declaration of Kurt Horvath, ¶ 7). Mr. Horvath told Kevin Fox that he had received plans for the project that Box Design was working on, and was informed by Mr. Fox that Box Design was not involved. (*See* Declaration of Kurt Horvath, ¶ 7). This circumstance is strongly indicative of the negative effect that Defendant's use of the "Box" mark has had upon Box Design's exclusivity rights and indicates that future confusion is extremely likely. Since there is evidence of actual confusion here, this factor weighs in favor of Plaintiff.

**(7)    An Intent On The Part of the Alleged Infringer to Palm Off Its Products As Those Of Another.**

"A defendant's intent is an 'important factor' and can even be weighed more heavily than other factors." *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 465 (7th Cir. 2000). While Box Design does not have testimony or declarations from Defendant as to their stated intent, their conduct makes their intent quite clear. Defendant's use of the word "Box" in its name cannot be considered

an accident. Defendant, while possibly using the name in the Denver, Colorado market, is a newly formed entity in Illinois. Box Design has been establishing a name and reputation for several years. Defendant has chosen the eye-catching portion of Plaintiff's name and used it for its own.

Additionally, in or around March of 2008, Kevin Fox had a telephone conversation with Daniel Kraiss, a principal of Defendant, and Mr. Kraiss tacitly admitted that his use of the "Box" mark was confusing and improper. (*See* Declaration of Kevin Fox, ¶ 19). Finally, Defendant has linked print articles on its website which relate to Plaintiff's designs and not their own. Did Defendant get confused by the similar name as well? Defendant's intent is quite clear and this factor weighs in Plaintiff's favor.

## II.     PLAINTIFF HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM IF PRELIMINARY RELIEF IS DENIED.

Plaintiff has demonstrated a significant likelihood of prevailing on the merits, more than is needed for granting a preliminary injunction. An injunction is necessary to Box Design to prevent the irreparable harm which will undoubtedly flow from Defendant's violations of the Lanham Act and Illinois trademark law.

Damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy. *See Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). Here, it is obvious that the goodwill Box Design has developed in the Chicagoland area for several years has been, and will continue to be, damaged by Defendant's copying of the salient portion of Plaintiff's name. The loss of a single customer or potential customer who deals with Defendant under the mistaken belief of an association with Box Design will result in harm that cannot adequately be remedied by money alone. Furthermore, Defendant's intentional

-12-

infringement imperils Box Design's ability to control what happens to its name, mark, and reputation. The Seventh Circuit has found that this alone "justifies a finding of irreparable harm." *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir. 1983).

**III.    THE BALANCE OF HARMS WEIGHS IN FAVOR OF BOX DESIGN.**

Now that Plaintiff has established the first two requirements it is necessary for the court to consider the third and fourth requirements in deciding whether or not to grant a preliminary injunction. The balance of harms in this case tips sharply in favor of the Plaintiff. Defendant chose the name Box Studio for the Chicagoland market knowing that it was confusingly similar to the federally registered mark of Box Design. Defendant's choice can only be viewed as a conscious attempt to trade on the reputation of Box Design, which has already established itself in the Chicago area. Having consciously copied the Box Design trademark, Defendant will not suffer hardship in having to now choose another name to use in selling its services. This is especially true given that the Box Studio name has only been in existence in Illinois since December 28, 2007.

Indeed, Plaintiff seeks only limited relief. Plaintiff does not seek to put Box Studio out of business or prevent Defendant from marketing and selling its architectural services in this, or other, markets. Plaintiff only seeks to ensure that Defendant does not capitalize on Box Design's valuable trademark rights, does not appropriate the name and goodwill established and developed by Box Design, does not confuse Box Design's customers into thinking that Defendant's product originate with Box Design, or that Defendant is somehow associated with Box Design.

The only burden on Defendant is to change the name of its business in the Chicagoland area so that it does not infringe upon the Box mark. Unlike Box Design, the Defendant has not established the Box Studio brand in the Chicago marketplace. Although Defendant may have to

-13-

expend funds to change the name of their newly-formed company, that harm was self-inflicted when Defendant knowingly chose to imitate Box Design's mark in an effort to confuse consumers. Having intentionally infringed on Box Design's rights, Box Studio should not gain sympathy in having to expend money in order to change its name. *Wesley-Jessen,* 698 F.2d at 867. A balance of the harms weighs heavily in favor of Box Design.

## IV.    AN INJUNCTION WILL NOT HARM THE PUBLIC INTEREST.

The entry of an injunction in this case will serve the public interest. The purpose of the trademark laws is to protect the public from deception and to preserve the reputation and goodwill of the trademark owner. *S. Rep. No. 1333, 79th Cong. 2d Sess. 3 91946, U.S. Code Cong. Serv. 1946, 1274.* That purpose will be served by an injunction. As the Seventh Circuit stated in *International Kennel Club:* "In trademark infringement cases, we have stated that the relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumers' interest in not being deceived about the products [and/or services] they purchase." *Intern. Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d at 1079, 1092 (7th Cir. 1988). Clearly in this case the public interest would be served by the entry of an injunction.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that this Court enjoin Defendant from any further use in the Chicagoland area of the Box Studio name, the "Box" mark, or any mark confusingly similar to the Box Design mark in any other manner likely to cause confusion, mistake or deception, or mistake or deception as to the source or sponsorship of Box Studio's services. Further, this Court should order the removal of the items on Box Studios' website that refer or relate to projects designed by the Plaintiff. Finally, this Court should order the seizure of any and all items

that use the Box Design mark in the Chicagoland area, including print literature, business cards, and

related items, along with costs and reasonable attorney's fees and such other further relief as is just.

Dated: June 19, 2008                           Respectfully submitted,
                                               BOX DESIGN, LLC,

                                               By:   s/ Silvia Mercado Masters
                                                        One of its Attorneys

John J. Rock
James B. Novy
Silvia Mercado Masters
ROCK FUSCO, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60610
(312) 494-1000

## <u>CERTIFICATE OF SERVICE</u>

I, Silvia Mercado Masters, hereby certify that a copy of the attached **Plaintiff's Memorandum of Law In Support of Motion for a Preliminary Injunction** has been served upon:

Jeffrey A. Pine
pine@vp-law.com

Charles C. Valauskas
ccv@vp-law.com

Allison Dudley
dudley@vp-law.com

via ELECTRONIC FILING on June 19, 2008.

s/ Silvia Mercado Masters
Silvia Mercado Masters

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BOX DESIGN, LLC, | ) | |
| | ) | No.: 08 C 3053 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Hibbler |
| | ) | |
| BOX STUDIO CHICAGO, LLC, | ) | Magistrate Judge Brown |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF KEVIN FOX PURSUANT TO 28 U.S.C. § 1746

I, Kevin Fox, declare under penalty of perjury as follows:

1.      I am the president of Box Design, LLC, the Plaintiff in the above-captioned matter. I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.      Box Design, LLC ("Box Design") is an architecture firm located in Chicago, Illinois.

3.      Box Design provides architecture services to development firms and individuals throughout the greater Chicagoland area. In particular, Box Design provides architectural services related to "green roofs" which is one way of combating the well reported phenomena of the greenhouse effect.

4.      Box Design has earned a prominent presence in the architecture industry and has sustained its presence for more than seven (7) years.

5.      In 2003, Box Design made the decision to brand itself by using the word BOX® to create a fanciful mark. BOX® is Box Design's corporate brand.

6.      To protect its distinctive presence in its markets, Box Design registered with the United States Patent and Trademark Office the word BOX®.

EXHIBIT

A

7.    Box Design also registered the term BOX® both as a word mark and coupled with a distinctive box logo design.

8.    The mark BOX® is federally registered under Registration Number 3,088,373. A copy of the Registration Certificate is attached hereto as Exhibit A.

9.    Box Design uses its distinctive BOX® trademark to promote and display information about its services and the company on its website: www.boxarch.com.

10.    Box Design also utilizes the BOX® mark and trade name when its services and projects have been the subject of print articles. It further uses the BOX® mark on its business cards, letterhead and promotional materials as well as on design drawings. (A copy of the print articles and business cards of Box Design are attached hereto as Exhibit B).

11.    To the best of my knowledge, Box Studios Chicago, LLC ("Box Studios") is a company affiliated with Box Studios, LLC a limited liability company originally based in Denver, Colorado. Box Studios recently filed its Articles of Organization with the Illinois Secretary of State and began working in Chicago using the Box Studios name. Box Studios is using the BOX mark in connection with its architectural services in the Chicagoland area.

12.    It is my understanding that Daniel J. Kraiss, is a principal of Box Studios.

13.    According to its website, www.boxformation.com, Box Studios provides architectural services similar to that of Box Design. Moreover, its website prominently uses the BOX mark as well as the color scheme of Box Design.

14.    Box Studios will, and does, compete directly with Box Design. Box Studios' services are offered in the same trade channels and seek sales from the same category of architectural customers as Box Design.

15.    It is very likely that Box Design's and Box Studios' customers and service providers will be confused given the striking similarity of the use of the word BOX by both entities.

16.    In fact, on or about March 7, 2008, I spoke with Kurt Horvath, who is the owner of Intrinsic Landscaping, a green-roof installation company with whom I have worked on other projects in the greater Chicagoland area. Kurt called me because he received plans for a project for which he was going to bid. The architectural drawings being used in connection with the project bore the word BOX where architects place their company name and contact information. (A copy of the architectural drawings are attached hereto as Exhibit C). Kurt informed me that he had received my plans and had a question that he needed to have answered before he submitted his bid. I, obviously, was confused because I was not aware of any plans out for bid and informed Kurt of this fact. Kurt responded to me that because he saw the word BOX on the drawings, he assumed that the plans were drawn by me and called me to discuss. However, I was not involved with the project.

17.    Despite the positive treatment in the press, green roofs are not very common and, as a result, the market for these services is small. Accordingly, in this industry, much business is done through telephone calls and face-to-face meetings. If your, or your company's, name is not "recognized," it is difficult to get projects or even an appointment with a customer. It is highly likely that Box Studios seeks to, and will, capitalize on any confusion to assist it in gaining access to certain customers in the Chicagoland area that would not have taken a call or made an appointment with Box Studios or some other company that is not as recognizable as Box Design. Choosing to use the BOX mark essentially gives Box Studios a "jump start" on name recognition in the green roof and architectural market in Chicago.

18.    It is also important to note that of the companies in this small industry, all of the

-3-

names are markedly different. For example, Box Design's main competitors are: Booth Hansen Associates, Studio Gang Architects and K2 Design Studio.

19.    I had immediate concerns regarding the potential for customer confusion given the use of the mark BOX by Box Studios. Thus, following my telephone call with Kurt Horvath, I spoke with a person who I understood was a principal of Box Studios, Daniel Kraiss. I called Mr. Kraiss by telephone to discuss his company's use of the mark BOX in or around March of 2008. Kraiss tacitly admitted that he knew of Box Design's use of the BOX mark and that his use of the BOX mark was confusing and improper.

20.    If Box Studios is allowed to continue to use the mark BOX in connection with its architectural services, Box Design will undoubtedly be harmed in its trademark rights as well as in the goodwill and the reputation it has established with its customers and potential customers.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 19, 2008

Kevin Fox



## CERTIFICATE OF REGISTRATION
### PRINCIPAL REGISTER

The Mark shown in this certificate has been registered in the United States Patent and Trademark Office to the named registrant.

The records of the United States Patent and Trademark Office show that an application for registration of the Mark shown in this Certificate was filed in the Office; that the application was examined and determined to be in compliance with the requirements of the law and with the regulations prescribed by the Director of the United States Patent and Trademark Office; and that the Applicant is entitled to registration of the Mark under the Trademark Act of 1946, as Amended.

A copy of the Mark and pertinent data from the application are part of this certificate.

To avoid CANCELLATION of the registration, the owner of the registration must submit a declaration of continued use or excusable non-use between the fifth and sixth years after the registration date. (See next page for more information.) Assuming such a declaration is properly filed, the registration will remain in force for ten (10) years, unless terminated by an order of the Commissioner for Trademarks or a federal court. (See next page for information on maintenance requirements for successive ten-year periods.)



*Director of the United States Patent and Trademark Office*

EXHIBIT

A

# REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

## Requirements in the First Ten Years*
### What and When to File:

- First Filing: A Declaration of Continued Use (or Excusable Non-use), filed between the 5th and 6th years after the registration date. (*See* 15 U.S.C. §1058; 37 C.F.R. §2.161.)
- Second Filing: A Declaration of Continued Use (or Excusable Non-use) **and** an Application for Renewal, filed between the 9th and 10th years after the registration date. (*See* 15 U.S.C. §1058 and §1059; 37 C.F.R. §2.161 and 2.183.)

## Requirements in Successive Ten-Year Periods*
### What and When to File:

- A Declaration of Continued Use (or Excusable Non-use) **and** an Application for Renewal, filed between each 9th and 10th-year period after the date when the first ten-year period ends. (*See* 15 U.S.C. §1058 and §1059; 37 C.F.R. §2.161 and 2.183.)

## Grace Period Filings*

There is a six-month grace period for filing the documents listed above, with payment of an additional fee.

**The U.S. Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements. Therefore, you should contact the USPTO approximately one year prior to the deadlines set forth above to determine the requirements and fees for submission of the required filings.**
**NOTE:** *Electronic forms for the above documents, as well as information regarding current filing requirements and fees, are available online at the USPTO web site:*

*www.uspto.gov*

> ### YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS IDENTIFIED ABOVE DURING THE SPECIFIED TIME PERIODS.

*Exception for the Extensions of Protection under the Madrid Protocol:
The holder of an international registration with an extension of protection to the United States must file, under slightly different time periods, a Declaration of Continued Use (or Excusable Non-use) at the USPTO. *See* 15 U.S.C. §1141k; 37 C.F.R. §7.36. The renewal of an international registration, however, must be filed at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol. *See* 15 U.S.C. §1141j; 37 C.F.R. §7.41.

Int. Cls.: 40 and 42

Prior U.S. Cls.: 100, 101, 103, and 106

**United States Patent and Trademark Office**

Reg. No. 3,088,373
Registered May 2, 2006

## SERVICE MARK
### PRINCIPAL REGISTER



BOX DESIGN, L.L.C. (ILLINOIS LIMITED LIABILITY CORPORATION)
SUITE 302
1021 S. STATE STREET
CHICAGO, IL 60605

FOR: CUSTOM MANUFACTURE OF ARCHITECTURE, BUSINESS CARDS, STATIONERY, POSTERS, SIGNAGE AND PROMOTIONAL MATERIALS FOR OTHERS, IN CLASS 40 (U.S. CLS. 100, 103 AND 106).

FIRST USE 3-0-2004; IN COMMERCE 3-0-2004.

FOR: ARCHITECTURAL DESIGN, GRAPHIC ART DESIGN, AND INDUSTRIAL DESIGN SERVICES FOR OTHERS, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 3-0-2004; IN COMMERCE 3-0-2004.

THE MARK CONSISTS OF THE WORD BOX IN A SQUARE, AND THE LETTER "O" IS ALSO IN A SQUARE.

SN 78-334,544, FILED 12-1-2003.

JILL C. ALT, EXAMINING ATTORNEY

# METROPOLIS



## FEATURES
### September 2006

Annual cost of cooling buildings in the U.S
## $40 billion

NEW YORK

# HOW GREEN IS YOUR CITY?

WASHINGTON, D.C.

Number of points a green roof can contribute to a LEED project

up to 11 of 69

BOSTON

"The Green Roofing of America" certainly has a nice ring to it, but the idea remains more wishful thinking than reality. True, there are more green roofs in operation than ever before, but the bulk of new construction is built without any environmental considerations at all. Still, in this era of dwindling resources and rising temperatures, it's worth noting that even the most banal green roof [think grass] offers real and lasting benefits. Like hybrid cars, green roofs look to us like an ecological no-brainer: an obvious solution to intractable problems. Our civic role model is Chicago, where the number of green roofs is reaching a robust critical mass. In hopes that the rest of us may follow its inspired lead, consider these projects a kind of instruction manual for healthier cities. —Martin C. Pedersen

○ www.metropolismag.com

SAN FRANCISCO

CHICAGO

Reduction in summer cooling needed for a one-story building with a four-inch grass roof as compared to one with a conventional roof

25%

97

EXHIBIT
B
exhibit



# PART TWO:
# SWEET
# SEDUM

Green-roof technology now offers a host of options—from the humble patch of grass to sophisticated feats of structural engineering.

## COMPONENTS

A. Paver
B. Paver support and drainage
C. Insulation
D. Building structure
E. Grass
F. Turf media
G. Filter fabric
H. Drainage layer with ballast
I. Root barrier
J. Waterproof membrane

### CHICAGO
Fox Design

As green-roof technology improves, the front yard—that symbol of sprawl and plentitude—may be poised to move from the suburbs to a more energy-efficient spot atop inner-city buildings. Recently, Chicago designer Kevin Fox added a lawn to the roof of the two-story building he occupies near the Sears Tower.

Fox made the $60,000 investment because his supplier, American Hydrotech, warranted a special plastic to keep the water that feeds the grass from dripping into his living space. "You coat the deck with the membrane using a squeegee," landscaper Kurt Horvath says. "It's so hot that it touches the other membrane that was laid down beforehand and fuses to become one solid membrane."

To deal with the increased load, Fox refitted the roof with steel joists and decking that supports the required seven to ten inches of soil. While grass is not an ideal plant for green roofs, it can still provide environmental and economic benefits. "Upkeep?" he says. "I mow the lawn here among all the high-rises. People look out their window and get a giggle out of it."
—Alec Appelbaum



ASLA
WASHIN
Michael Va

When the
Landscap
build a gr
ton, D.C.,
Valkenbur
stood the
was going
says, "the
publicly t
ing garde
For the
the China
Valkenbu
extruded
port mult
filler, pres
wood dec
tors to pr
plants. Th
"waves" w
soil slope
from the m
reach wa
a dramat
a shelter
Van Val
ect provi
"We tried
more tha
what wou
the proje
allow AD
the rooft
the roofs
of small
retrofit,"
tackling
Boston A

1995
Fukuoka
Prefectural
International Hall
Fukuoka, Japan

Emilio Ambasz transposes a 100,000-square-foot park in the city center onto 15 terraces of a new government building.

1997
Gap Headquarters
San Bruno, CA
William McDonough creates eco-friendly headquarters for the Gap, including a 69,000-square-foot green roof.

1998
Chicago
After seeing green roofs in Germany, Mayor Richard M. Daley directs municipal funds toward green-roof development.

1998
Washingt
The U.S.
the LEED
can confir
the 59-pa



METROPOLIS

IN STORES NOW
Looking at Los Angeles

CONTINUING
EDUCATION

DESIGNMART

EVENTS

LIVE@METROPOLIS

METROPOLIS POV

MAGAZINE

METROPOLIS@25

METROPOLIS BOOKS

NEXT GENERATION

SUBSCRIBE

SUSTAINABLE
METROPOLIS

TROPICAL GREEN

URBAN JOURNAL

**
ASLA HEADQUARTERS: Washington, D.C.: Michael Van Valkenburgh
Associates

SUBSCRIBE | NEWSLETTER | MAGAZINE | ARCHIVES | AD INFO | PRODUCT INFO | CON

SEARCH:

🖶 PRINT

✉ E-MAIL

🔊 TALK2U

SEPTEMBER 2006 • MAGAZINE

# Sweet Sedum

Posted September 11, 2006

**Green-roof technology now offers a host of options—from the humble patch of grass to sophisticated feats of structural engineering.**

As green-roof technology improves, the front yard—that symbol of sprawl and plentitude—may be poised to move from the suburbs to a more energy-efficient spot atop inner-city buildings. Recently, Chicago designer Kevin Fox added a lawn to the roof of the two-story building he occupies near the Sears Tower.

**FOX RESIDENCE: Chicago: Box Design**

Fox made the $60,000 investment because his supplier, American Hydrotech, warranted a special plastic to keep the water that feeds the grass from dripping into his living space. "You coat the deck with the membrane using a squeegee," landscaper Kurt Horvath says. "It's so hot that it touches the other membrane that was laid down beforehand and fuses to become one solid membrane."

To deal with the increased load, Fox refitted the roof with steel joists and decking that supports the required seven to ten inches of soil. While grass is not an ideal plant for green roofs, it can still provide environmental and economic benefits. "Upkeep?" he says. "I mow the lawn here among all the high-rises. People look out their window and get a giggle out of it." —Alec Appelbaum

Be the first to comment on this article



**FOX RESIDENCE: Chicago: Box Design**
Nathan Kirkman

Sweet Sedum



BRETFORD

NO ONE
ADAPTS
TO THE
NEEDS OF
A SPACE
LIKE
BRETFORD

BRETFORD



When the American Society of Landscape Architects decided to build a green roof on its Washington, D.C., headquarters, Michael Van Valkenburgh immediately understood the implications. "If ASLA was going to hire a landscaper," he says, "the reason would be to show publicly that it could be an operating garden."

For the 3,300-square-foot roof of the Chinatown building, Michael Van Valkenburgh Associates (MVVA) extruded the elevator shaft to support multiple layers of insulation filler, preexisting mechanicals, a wood deck, and steel grating for visitors to provide cover for some plants. Then the firm created two "waves" with 4.5-inch and 6.5-inch soil slopes to maximize visibility from the street. Since public outreach was a priority, MVVA designed a dramatic stairway that opens to a shelter with a skylight.

Van Valkenburgh hopes the project provides a useful case study. "We tried a regional pattern with more than twenty species to see what would do well up there." Sadly the project's $900,000 budget didn't allow ADA-accessible ramps amid the rooftop mechanicals. "Much of the roofscapes of cities are made of smaller roofs that are difficult to retrofit," he says. The firm is now tackling a similar challenge at the Boston Architectural College. —A.A.

**

**MASS GENERAL HOSPITAL: Boston: Cambridge Seven Associates and Halvorson Design Partnership**

Like most health-care institutions, Massachusetts General Hospital serves its patients first. But in planting a 6,500-square-foot healing garden on top of its Yawkey Center—a new outpatient facility designed by Cambridge Seven Associates—the hospital was able to give cancer patients a long sought-after amenity and conserve energy in the process.

Rob Adams of Halvorson Design Partnership, the roof's landscape architects, says the healing garden offers all the benefits of a green roof without the science-experiment gadgetry typical of many projects. The firm instead concentrated on the patient experience, setting teak benches in clusters around mostly native perennials like paperbark maple, river birch, and blueberry. The environmental benefits have largely taken care of themselves. With a soil depth of eight to 36 inches, the roof is four times more efficient as insulation than a conventional roof and has attracted a range of butterflies and birds. —Michael Silverberg

**

**ROOFTOP FARMS: Liuzhou, China: William McDonough + Partners**
William McDonough has been at the forefront of green roofs for almost a decade now.



















Sweet Sedum



Recently his firm unveiled a conceptual proposal to bring rooftop farms to Chinese cities that are losing cropland at an alarming rate. For example, the city of Liuzhou—a former agricultural center in southern China with an oxbow river on its border and a surging population—is rapidly running out of places to plant soybeans and sugarcane.

With help from the China-US Center for Sustainable Development, McDonough has envisioned a series of buildings with bridges connecting soil-bed roofs. German green-roof manufacturer Xeroflor will analyze how much weight in tree roots and rice-paddy water the roofs can handle.

"The premier of China has said that if the country continues its current pace it will lose twenty-five percent of its farmland by 2020," McDonough says. "The current urbanization puts pressure on the good farmland, which is around the cities—and that pressure will then transfer itself to the perimeter, where the marginal lands are. Those lands are typically the last reserves of the natural world." —A.A.

\*\*

## CALIFORNIA ACADEMY OF SCIENCES: San Francisco: Renzo Piano Building Workshop

Renzo Piano's design for the California Academy of Sciences, in San Francisco, possesses a stunning gesture of apparent simplicity: the 370,000-square-foot building features a rolling 2.5-acre "living roof" that—after completion next year—will stitch the structure back into its bucolic Golden Gate Park site. Centerpiece to a comprehensive environmental effort that the academy hopes will merit a LEED Platinum rating, the living roof is an intense feat of structural engineering and horticultural know-how.

"We've got slopes up to sixty degrees on these hills," says Jean Rogers, an environmental engineer with Arup's San Francisco office. "Trying to keep the structural integrity of that soil bed—which is about a foot thick—while puncturating the roof with skylights was a challenge." The structural steel system supports a drainage layer, a filter sheet, a growing medium, and up to 1.7 million native California plants. Prior to construction, a full-scale roof mock- up was built in Hayward.

Plant selection has been equally rigorous. A team of landscape specialists and the academy's in-house botanists tested 36 native California plant species, and ultimately selected a total of eight. "Before we moved, we tested a variety of species on the roof of the old building," says Frank Almeda, a senior curator at the academy's botany department. The living roof is currently being grown off-site, in Marin County. —Martin C. Pedersen








Be the first to comment on this article

Page 3 of 4

Sweet Sedum

Brilliant, Engaging, But Modest It's Not
Welcome To The Working Week
Cottage Industry
Jeanne Gang: The Art of Nesting
Looming Debate
Bookshelf
Sorting It Out
Custom Filtering
Sticks and Stones
Workers of the World, Unite

*Subscribers' exclusive*

Where's Home?
Tigerman Sees Red (and Topaz)
It's Not Business as Usual
A River Runs Through It
Up on the Farm
Modern Paradise
Castles in the Sand
Dubai, Doha
On Dry Land
IDEO's Urban Pre-Planning

MASTHEAD | SUBMISSIONS | AWARDS | PRIVACY POLICY | TERMS OF USE

BACK TO TOP





# It's a classic city-boy-meets- country-girl story.

Architect Kevin Fox, who grew up in River Forest, and his wife, Dawn, who spent her childhood in Peoria, were searching for the perfect home for their growing family, one that would balance his desire for a sleek urban abode with her longing for a back yard and green space.

The ideal solution presented itself in the South Loop: a two-story building with commercial tenants on the first floor, above which Kevin could carve out a three-bedroom loft with an interior atrium and a green roof complete with lush grass and trees. "I knew my wife would love the space if I could create a yard on our roof," he says. Kevin, who holds a master's degree in architecture from the Illinois Institute of Technology and has his own firm, Box Design Studio, was familiar with the city's initiatives encouraging the use of green roofs, and jumped at the chance to take advantage.

Such a highly visible rooftop yard in a dense urban area tends to attract attention. The Foxes like to play with their young son on their neat lawn, which is bordered on all sides by a waist-high fence, and which they tame with an eco-friendly battery-powered mower. The couple's two border collies are also big fans of the space. "I'll mow the lawn, or the dogs will chase each other around the roof, and it's not unusual for people in the surrounding offices to come to the windows and watch in amazement," Kevin says.



A central, glass-walled atrium allows light to flow throughout the apartment. A sculpture by artist John Henry serves as a focal point, suggesting The Fours on the roof of their South Loop loft, enjoying the great views with their three children.





The living, dining, and kitchen areas flow seamlessly to create an open living plan. **Opposite:** The kitchen was designed to make good use of the atrium's natural light.

**B**ecause he was creating a green roof, the city fast-tracked the building permits for the project (they came in less than three weeks), meaning some choices were made during construction rather than planned months ahead. "I would say that 99 percent of the time it's a bad thing to have to make a decision as you go," says Kevin, who, with his wife, was selecting kitchen counters and fixtures even as the space was being gutted and rebuilt for the renovation. "But it's better than not making a decision at all."

One choice proved remarkably easy to make. A glass-walled interior atrium, open to the green roof above, provides light and air for the space and serves as the focal point of the entire home. "Even though it meant losing one-ninth of the floor space, the atrium also gave the apartment an axis," Kevin says. "It really laid itself out once we planned the atrium, and separating public space from private space was the key."

Surrounding the atrium, which features a striking steel sculpture by artist John Henry, is the living and dining area, which flows into an open kitchen. "My favorite room is the kitchen," Dawn says. "Since our kitchen, dining, and living room are all open to each other, this makes being a family an interactive experience. We're all pretty much together regardless of what we are doing."

On the east side of the building are the apartment's bedrooms and master suite. A minimalist white crib and a Mies van der Rohe daybed give the baby's room a clean, modern feel. The adjacent guest room provides space for Dawn's mother, who visits often from Peoria. The master bedroom, just down the hall, features floor-to-ceiling windows that slide out of the way like pocket doors, opening the room to the atrium.





The Foxes kept the apartment's furnishings simple, sticking with modern classics in neutral colors with punches of red. **Left:** Dawn Fox prepares a snack for her son in the clean-lined contemporary kitchen.

O f course, even the most seamless design projects offer a challenge or two. For Kevin, that challenge was designing the master bathroom, a spacious spa suite off the master bedroom. When he began laying out the apartment, he discovered that an earlier fire had taken the top four stories off the building's original six. This change in the building's architecture made it difficult to create a bathroom that fit properly in the same grid as the rest of the space.

"I spent the better part of a day puzzling over how to resolve this problem," Kevin says. The solution required turning the focus of the bathroom inward by creating a dividing wall in the middle of the space, to anchor it. On one side, Kevin placed a long vanity with double sinks facing a wall of built-in wardrobes. On the other, where light from the exterior windows pours in, a deep soaking tub offers a quiet respite. Linking both sides is a large tiled shower room with a spa-style raised wood floor and doors that open to both sides of the bathroom.

Because the atrium and roof ate up so much of the project's budget, Kevin made smart choices in the rest of the home's materials and finishes, including plain but luxurious-looking birch



"OUR KITCHEN,
DINING, AND LIVING
ROOM ARE ALL
OPEN....THIS MAKES
BEING A FAMILY
AN INTERACTIVE
EXPERIENCE."



## Green on Top

Thinking of adding a green roof to your home? Doing so helps the environment and also offers economic benefits, thanks to a program put in place by Mayor Daley and the city's Department of Environment.

Kevin Fox's favorite room is the rooftop office, with its views of the green roof and the cityscape beyond.



slab doors painted a cool dark gray. Ornamentation was kept to a minimum, and when it came time to fill in the space with furniture and artwork, the Foxes kept the focus simple, sticking to contemporary classics in neutral tones with punches of bold red here and there.

The green space is not the only feature of the apartment that mimics suburban living. Kevin included all kinds of clever storage, including closets tucked under staircases. And in the basement of the building, he installed a European-style car lift (less expensive than purchasing parking spaces downtown) to create a two-car garage. The subterranean finished space even has a small woodworking shop.

Of all the ingenious surprises built into his urban loft, Kevin favors one above all others. It's his rooftop office, which features views of the city and offers quiet inspiration for planning new works. "This was a fun project to design," he says, "but it is particularly a fun project to live in." ■

*For information on resources, see Buyer's Guide, page 105.*



**Above, left:** The master bedroom's interior glass walls open to the atrium, letting in fresh air in warm weather.
**Above, right:** The master bathroom's long double vanity has ample storage for stashing clutter out of sight.





A deep acrylic and fiberglass soaking tub is tucked into a secluded corner of the spa-style master bathroom.

## Buyer's Guide continued

Center island countertop, Imperial granite in coffee, Damar Natural Stone, 750 Anthony Tr., Northbrook, 847-272-6666; installation by Victor Design, 6127 N. Claremont Ave., 773-406-5133. Main countertop, poured concrete in dijon, Soupcan, 1500 S. Western Ave., 312-243-6928. KitchenAid hood, Fisher & Paykel stovetop. GE oven, KitchenAid refrigerator, Frigidaire dishwasher, all from Abt Electronics, 1200 N. Milwaukee Ave., Glenview, 847-967-8830. Franke PSX110 sink and KWC Domo faucet, Community Home Supply, 3924 N. Lincoln Ave., 773-281-7010. Banquette upholstery in hush coffee, Architex International, 3333 Commercial Ave., Northbrook; pillow upholstery from Kravet, 6-128 Merchandise Mart, 312-527-0505. Dining table and chairs, Lignet Roset, 56 E. Walton St., 312-867-1207. **Child's room:** Retro Squares wallpaper, Urban Source, 1432 W. Chicago Ave., 312-455-0505. Oeuf crib/bed, modernnursery.com. Dwell Baby bedding and pillows, The Red Balloon Co., 2060 N. Damen Ave., 773-489-9800. Offi Mini-Drawer Chair, offi.com. Dash & Albert rug, The Red Balloon Co. **Master bath:** Golden onyx mosaic tile, The Tile Gallery. Jerusalem Gold floor tiles, Damar Natural Stone. Two-way mirror, LaSalle Glass & Mirror Co., 401 N. Armour St., 312-850-3070.

Robern MP-16 medicine cabinets, Newform X-T faucets, Toto Supreme elongated toilet, Barclay Square Vessel sinks, all from Max Gerber, 2293 N. Milwaukee Ave., 773-342-7600. Grohe Atrio shower system, Community Home Supply. Flos Tin Square light fixture (near mirrors), Source of Light. Shower enclosure, Bartlett Shower Doors, 2219 N. Clybourn Ave., 773-975-0069.

**The Great Outdoors, p. 74**

**Architecture and interior design:** Kevin Fox, Box Design Studio, 10 E. 11th St., 312-786-9655, boxarch.com. **Living room:** Modern sectional sofa, Montauk, 401 N. Wells St., 312-951-5688. Pop chair and ottoman, Ligne Roset, 56 E. Walton St., 312-867-1207. Le Corbusier chaise, European Furniture Warehouse, 2145 W. Grand Ave., 312-243-1955. Parsons table base, Room & Board, 55 E. Ohio St., 312-243-1955. Arco floor lamp, Design Within Reach, 10 E. Ohio St., 312-280-4677. Entertainment center custom designed by Kevin Fox, Box Design Studio. Drapery, Indecor, 5009 N. Winthrop Ave., 773-561-7670. **Dining room:** Custom-designed table by Kevin Fox, Box Design Studio. Sala chairs, Ligne Roset. Xenon Architectural light fixture, Lightology, 215 W. Chicago Ave., 312-944-1000. Nest high chair, ModernNursery, 877-663-2224, modernnursery.com. Coffee table base, Room & Board. Frames, set of nine, Room & Board. Gratia Orb planter, Design



Within Reach. **Kitchen:** Cabinets designed by Harold Skulte, Bulthaup, 165 W. Chicago Ave., 312-787-9982. Counter stools, Design Within Reach. Basaltina stone countertop (and stone used throughout the home), Stone Source, 414 N. Orleans St., 312-335-9900. Artwork, aqua abstract by Heather Roraback, tinycookie.com, 206-819-1939. **Atrium:** Sculpture, "Red Bird" by John Henry, johnhenrysculptor.com. Case Study stainless loveseat, Modernica, 555 N. Franklin St., 312-222-1808. Fire pit, Red Envelope, redenvelope.com, 877-733-3683. Planter, Sprout Home, 745 N. Damen Ave., 312-226-5950. **Master bedroom:** Anna bed, Ligne



# FAUX DESIGN STUDIO

- **Innovators in Faux Finishing**
- **Ground-breaking finishes and techniques**
- **Featured on HGTV**

Our renowned team of professional decorative artisans creates exquisite environments. The Midwest distributor of the full line of Faux Effects® products.

## Professional Products ▪ Professional Results

Visit our gallery-style showroom or view our work at www.fauxdesignstudio.com

**101 North Swift Road    ▪    Addison, IL 60101    ▪    (630) 627-1011**

SEND TO PRINTER    | CLOSE WINDOW

# The Great Outdoors

**KIM ATKINSON**



**PHOTO BY PHOTOGRAPHY BY NATHAN KIRKMAN**

I t's a classic city-boy-meets-country-girl story. Architect Kevin Fox, who grew up in River Forest, and his wife, Dawn, who spent her childhood in Peoria, were searching for the perfect home for their growing family, one that would balance his desire for a sleek urban abode with her longing for a back yard and green space.

The ideal solution presented itself in the South Loop: a two-story building with commercial tenants on the first floor, above which Kevin could carve out a three-bedroom loft with an interior atrium and a green roof complete with lush grass and trees. "I knew my wife would love the space if I could create a yard on our roof," he says. Kevin, who holds a master's degree in architecture from the Illinois Institute of Technology and has his own firm, Box Design Studio, was familiar with the city's initiatives encouraging the use of green roofs, and jumped at the chance to take advantage.



**: : : view slideshow**

**From the street, passersby could never imagine the green oasis atop this home.**

Such a highly visible rooftop yard in a dense urban area tends to attract attention. The Foxes like to play with their young son on their neat lawn, which is bordered on all sides by a waist-high fence, and which they tame with an eco-friendly battery-powered mower. The couple's two border collies are also big fans of the space. "I'll mow the lawn, or the dogs will chase each other around the roof, and it's not unusual for people in the surrounding offices to come to the windows and watch in amazement," Kevin says.

Because he was creating a green roof, the city fast-tracked the building permits for the project (they came in less than three weeks), meaning some choices were made during construction rather than planned months ahead. "I would say that 99 percent of the time it's a bad thing to have to make a decision as you go," says Kevin, who, with his wife, was selecting kitchen counters and fixtures even as the space was being gutted and rebuilt for the renovation. "But it's better than not making a decision at all."

One choice proved remarkably easy to make. A glass-walled interior atrium, open to the green roof above, provides light and air for the space and serves as the focal point of the entire home. "Even though it meant losing one-ninth of the floor space, the atrium also gave the apartment an axis," Kevin says. "It really laid itself out once we planned the atrium, and separating public space from private space was the key."

Surrounding the atrium, which features a striking steel sculpture by artist John Henry, is the living and dining area, which flows into an open kitchen. "My favorite room is the kitchen," Dawn says. "Since our kitchen, dining, and living room are all open to each other, this makes being a family an interactive experience. We're all pretty much together regardless of what we are doing."



**Kevin Fox's favorite room is the rooftop office, with its views of the green roof and the cityscape beyond.**

On the east side of the building are the apartment's bedrooms and master suite. A minimalist white crib and a Mies van der Rohe daybed give the baby's room a clean, modern feel. The adjacent guest room provides space for Dawn's mother, who visits often from Peoria. The master bedroom, just down the hall, features floor-to-ceiling windows that slide out of the way like pocket doors, opening the room to the atrium.

Of course, even the most seamless design projects offer a challenge or two. For Kevin, that challenge was designing the master bathroom, a spacious spa suite off the master bedroom. When he began laying out the apartment, he discovered that an earlier fire had taken the top four stories of the building's original six. This change in the building's architecture made it difficult to create a bathroom that fit properly in the same grid as the rest of the space.

"I spent the better part of a day puzzling over how to resolve this problem," Kevin says. The solution required turning the focus of the bathroom inward by creating a dividing wall in the middle of the space, to anchor it. On one side, Kevin placed a long vanity with double sinks facing a wall of built-in wardrobes. On the other, where light from the exterior windows pours in, a deep soaking tub offers a quiet respite. Linking both sides is a large tiled shower room with a spa-style raised wood floor and doors that open to both sides of the bathroom.

Because the atrium and roof ate up so much of the project's budget, Kevin made smart choices in the rest of the home's materials and finishes, including plain but luxurious-looking birch slab doors painted a cool dark gray. Ornamentation was kept to a minimum, and when it came time to fill in the space with furniture and artwork, the Foxes kept the focus simple, sticking to contemporary classics in neutral tones with punches of bold red here and there.

The green space is not the only feature of the apartment that mimics *suburban* living. Kevin included all kinds of clever storage, including closets tucked under staircases. And in the basement of the building, he installed a European-style car lift (less expensive than purchasing parking spaces downtown) to create a two-car garage. The subterranean finished space even has a small woodworking shop.

Of all the ingenious surprises built into his urban loft, Kevin favors one above all others. It's his rooftop office, which features views of the city and offers quiet inspiration for planning new works. "This was a fun project to design," he says, "but it is particularly a fun project to live in."

*For information on resources, see Buyer's Guide.*

**PHOTOGRAPHY BY NATHAN KIRKMAN**

design studio

kevin fox . partner . designer
312.286.5861 kfox@boxarch.com
www.boxarch.com





EXHIBIT

C

2620 W. WASHINGTON
CHICAGO, IL



2620 W. WASHINGTON

CHICAGO, IL



2620 W. WASHINGTON

CHICAGO, IL

A1.03



2620 W. WASHINGTON

CHICAGO, IL



1/A1.07  PARTITION PLAN - ROOF

LEGEND

SCALE: 1/8" = 1'-0"

2620 W. WASHINGTON

CHICAGO, IL

BOX STUDIOS

PARTITION PLAN
ROOF

A1.07

*File Number*     0241663-8



## STATE OF ILLINOIS
### OFFICE OF
### THE SECRETARY OF STATE

# *To all to whom these Presents Shall Come, Greeting:*

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that*
ATTACHED HERETO IS A TRUE AND CORRECT COPY, CONSISTING OF 2 PAGE(S),
AS TAKEN FROM THE ORIGINAL ON FILE IN THIS OFFICE FOR BOX STUDIO
CHICAGO LLC.

**In Testimony Whereof,** *I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this* 12TH *day of* JUNE *A.D.* 2008 .



*Jesse White*

SECRETARY OF STATE

Authentication #: 0816401151
Authenticate at: http://www.cyberdriveillinois.com



**EXHIBIT**

B

| Form **LLC-5.5**<br>April 2007<br><br>**Secretary of State Jesse White**<br>Department of Business Services<br>Limited Liability Division<br>501 S. Second St., Rm. 351<br>Springfield, IL 62756<br>217-524-8008<br>www.cyberdriveillinois.com<br><br>Payment must be made by certified check,<br>cashier's check, Illinois attorney's check,<br>C.P.A.'s check or money order payable to<br>Secretary of State. | Illinois<br>Limited Liability Company Act<br>**Articles of Organization**<br><br>IIIIIIIIIIIIIIIIIIIIIIII<br>**LL0018092**<br>This space for use by Secretary of State.<br><br>**Filing Fee:**  $500<br>**Approved:**  *PS* | **FILE #** *02416638*<br>This space for use by Secretary of State.<br><br>*FILED: DEC 28, 2007*<br><br>*JESSE WHITE*<br>**SECRETARY OF STATE** |

1.  Limited Liability Company Name:  Box Studio Chicago LLC

    The LLC name must contain the words Limited Liability Company, L.L.C. or LLC and cannot contain the terms Corporation, Corp., Incorporated, Inc., Ltd., Co.,
    Limited Partnership or L.P.

2.  Address of Principal Place of Business where records of the company will be kept: (P.O. Box alone or c/o is
    unacceptable.)

    17 North State Street  Suite 1350, Chicago, Illinois 60602

3.  Articles of Organization effective on: (check one)
    ☑ the filing date
    ☐ a later date (not to exceed 60 days after the filing date): _____
                                                                    Month, Day, Year

4.  Registered Agent's Name and Registered Office Address:

    Registered Agent: __Ferdinand R. Dimailig_____
                       First Name              Middle Initial          Last Name

    Registered Office:  17 North State  Suite #1350
    (P.O. Box alone or   Number                    Street                      Suite #
    c/o is unacceptable.)              *COOK*
                        Chicago, IL  60602
                        City                    ZIP Code                    County

5.  Purpose(s) for which the Limited Liability Company is organized: (If more space is needed, attach additional sheets of
    this size.)

    "The transaction of any or all lawful business for which Limited Liability Companies may be organized under this Act."

6.  Latest date, if any, upon which the company is to dissolve: _____
    **(Leave blank if duration is perpetual.)**                    Month, Day, Year

Printed by authority of the State of Illinois. April 2007 — 4M — LLC-4.11

**LLC-5.5**

7.  **(OPTIONAL)** Other provisions for the regulation of the internal affairs of the Company: (If more space is needed, attach additional sheets of this size.)

8.  The Limited Liability Company: (Check either a or b below.)
    a. ☐ is managed by the manager(s) (List names and business addresses.)

    b. ☑ has management vested in the member(s) (List names and addresses.)

    Daniel J. Kraiss - 17 North State Street  Suite 1350, Chicago, IL 60602

    Ferdinand R. Dimailig - 17 North State Street  Suite 1350, Chicago, IL 60602

9.  **Name and Address of Organizer(s)**
    I affirm, under penalties of perjury, having authority to sign hereto, that these Articles of Organization are to the best of my knowledge and belief, true, correct and complete.

    Dated ___December 28_____ , _2007___
    　　　　　　　Month & Day　　　　　　　　Year

    1. _~Dan'Ka~_ (signature)
       Signature
       DANIEL J. KRAISS
       Name (type or print)

       Name if a Corporation or other Entity, and Title of Signer

    2. _~signature~_
       Signature
       FERDINAND R. DIMAILIG
       Name (type or print)

       Name if a Corporation or other Entity, and Title of Signer

    1. 17 North State Street　　Suite 1350
       Number　　　　　　　　Street

       Chicago
       　　　　　　City/Town

       Illinois　　　　　60602
       State　　　　　　　ZIP Code

    2. 17 North State Street　　Suite 1350
       Number　　　　　　　　Street

       Chicago
       　　　　　　City/Town

       Illinois　　　　　60602
       State　　　　　　　ZIP Code

**Signatures must be in black ink on an original document. Carbon copy, photocopy or rubber stamp signatures may only be used on conformed copies.**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOX DESIGN, LLC, | ) | No.: 08 C 3053 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Hibbler |
| | ) | |
| BOX STUDIO CHICAGO, LLC, | ) | Magistrate Judge Brown |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF KURT HORVATH PURSUANT TO 28 U.S.C. § 1746

I, Kurt Horvath, declare under penalty of perjury as follows:

1.    I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.    I am the owner of Intrinsic Landscaping, which is a full service landscaping construction and maintenance company. We provide complete green roof implementations for private clients, roofing contractors, design and architectural firms, corporate developers and municipal clients.

3.    One of the architectural firms that I have worked with in the past was Box Design, LLC ("Box Design"). During that/those project(s), I came to know Kevin Fox, who is the owner of Box Design. I have enjoyed working with Kevin and recognize the name BOX on architectural plans as associated only with Box Design and/or Kevin Fox.

4.    In March of 2008, I received an electronic mail ("e-mail") message from SKG Historic, Inc. ("SKG") that had attached to it a pdf document of plans for which I was asked to provide a quotation for services to provide a green roof.

5.    Upon opening the attachment, I quickly noticed the plans contained the word "BOX"



EXHIBIT

C

where the architecture firm would list its name.   Immediately, I thought it was great that I may have the opportunity to work with Kevin Fox on another project as I have come to associate the word "BOX" as it relates to architectural design solely with Box Design.

6.     I have worked with design and architectural firms for several years. I am unaware of any other design or architectural firm which uses the word "BOX" in its name besides Box Design.

7.     During the course of my review of the plans in order to prepare the bid, I thought of a few questions which prompted me to call Kevin to discuss.  So, I called Kevin and told him that I had received plans for a project that Box Design was working on.  Kevin immediately told me that he was confused as he was not aware of any projects that were sent out to bid.  I then forwarded to Kevin the e-mail that I had received from SKG. He responded that it was not his company who had prepared the drawings.

8.     The use of BOX by this other company was confusing to me as I immediately thought of Box Design when I saw the word BOX on the plans.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 13, 2008                    _____
                                                        Kurt Horvath